```
                UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF NORTH CAROLINA
                     NORTHERN DIVISION

UNITED STATES OF AMERICA,      )
                               )
                 Plaintiff,    )          Docket No.
                               )       2:25-CR-00004-M-RN-1
      v.                       )
                               )
ANTON MONTES VERNON,           )
                               )
                 Defendant.    )

             *****************************

               TUESDAY, JULY 1, 2025
             TRANSCRIPT OF MOTION TO SUPPRESS
         BEFORE THE HONORABLE RICHARD E. MYERS II
            UNITED STATES CHIEF DISTRICT JUDGE

APPEARANCES:

On Behalf of the Government:

      Philip L. Aubart, Esquire
      U.S. Attorney's Office
      150 Fayetteville Street, Suite 2100
      Raleigh, North Carolina 27601

On Behalf of the Defendant:

      Leza Lee Driscoll, Esquire
      Eric Brignac, Esquire
      Federal Public Defender's Office
      150 Fayetteville Street Mall, Suite 450
      Raleigh, North Carolina 27601
```

```
           JENNIFER C. CARROLL, RMR, CRR, CRC
                 Official Court Reporter
               United States District Court
                 Wilmington, North Carolina
          Stenotype with computer-aided transcription
```

|  | 1 | <u>Tuesday, July 1, 2025, at 2:03 p.m.</u> |
|---|---|---|

<table>
<tr><td>14:03:31</td><td>2</td><td><b>P R O C E E D I N G S</b></td></tr>
<tr><td>14:03:31</td><td>3</td><td>THE COURT:  All right.  If the clerk will please</td></tr>
<tr><td>14:03:32</td><td>4</td><td>call the case.</td></tr>
<tr><td>14:03:34</td><td>5</td><td>THE CLERK:  <i>United States of America versus Anton</i></td></tr>
<tr><td>14:03:37</td><td>6</td><td><i>Montes Vernon.</i></td></tr>
<tr><td>14:03:37</td><td>7</td><td>THE COURT:  All right.  Counsel, please state your</td></tr>
<tr><td>14:03:40</td><td>8</td><td>appearance for the record.</td></tr>
<tr><td>14:03:42</td><td>9</td><td>MR. AUBART:  Philip Aubart for the United States,</td></tr>
<tr><td>14:03:44</td><td>10</td><td>Your Honor.</td></tr>
<tr><td>14:03:44</td><td>11</td><td>MS. DRISCOLL:  Leza Driscoll for Mr. Vernon.</td></tr>
<tr><td>14:03:47</td><td>12</td><td>MR. BRIGNAC:  Eric Brignac for Mr. Vernon.</td></tr>
<tr><td>14:03:52</td><td>13</td><td>THE COURT:  All right.  Good afternoon, everybody.</td></tr>
<tr><td>14:03:54</td><td>14</td><td>We're here today to reopen the taking of evidence in the</td></tr>
<tr><td>14:03:58</td><td>15</td><td>case of <i>United States of America versus Anton Montes</i></td></tr>
<tr><td>14:04:02</td><td>16</td><td><i>Vernon.</i>  The Court has held a full suppression hearing in</td></tr>
<tr><td>14:04:06</td><td>17</td><td>this matter, but new video evidence has come to light; that</td></tr>
<tr><td>14:04:10</td><td>18</td><td>is a video of the law enforcement interaction with</td></tr>
<tr><td>14:04:16</td><td>19</td><td>Mr. Vernon from another angle.  The Court has reviewed it</td></tr>
<tr><td>14:04:19</td><td>20</td><td>in camera.  It was provided to the Court in advance of</td></tr>
<tr><td>14:04:22</td><td>21</td><td>today's hearing.  But I'm going to permit the United States</td></tr>
<tr><td>14:04:25</td><td>22</td><td>to put on the evidence and we'll ask any additional</td></tr>
<tr><td>14:04:29</td><td>23</td><td>questions that are deemed necessary from the new posture</td></tr>
<tr><td>14:04:33</td><td>24</td><td>and then hear any additional argument that occurs on the</td></tr>
<tr><td>14:04:38</td><td>25</td><td>basis of the new evidence.</td></tr>
</table>

| | |
|---|---|
| 14:04:42 | 1 |
| 14:04:45 | 2 |
| 14:04:48 | 3 |
| 14:04:52 | 4 |
| 14:04:58 | 5 |
| 14:05:03 | 6 |
| 14:05:09 | 7 |
| 14:05:12 | 8 |
| 14:05:16 | 9 |
| 14:05:18 | 10 |
| 14:05:21 | 11 |
| 14:05:25 | 12 |
| 14:05:29 | 13 |
| 14:05:39 | 14 |
| 14:05:41 | 15 |
| 14:07:32 | 16 |
| 14:07:37 | 17 |
| 14:07:39 | 18 |
| 14:07:44 | 19 |
| 14:07:49 | 20 |
| 14:07:55 | 21 |
| 14:07:59 | 22 |
| 14:08:01 | 23 |
| 14:08:06 | 24 |
| 14:08:07 | 25 |

And I'll just say preliminary, it appears to the Court, on the basis of the prior hearing, that there are really two different justifications. One is there's a smell of marijuana prior to the search, and so there is a search for marijuana; and then there is the Terry frisk for weapons. And I think those two justifications overlap. And so I'll hear from the parties to the extent to which the new evidence impacts either of those justifications.

Mr. Aubart.

MR. AUBART: Yes, Your Honor. So you have the entire video. I'm going to start it at 2:15, which is before the first individual is searched, and run it through the completion of the search of Mr. Vernon. So starting at 2:15.

(Video recording played.)

MR. AUBART: Stopping at 4:07, Your Honor.

That's the other angle that the Government believes is relevant to what occurred here. I think Ms. -- I think Detective White's testimony was fulsome in terms of his reasoning for conducting the frisk and the encounter and how he conducted it. So he is present here if the Court would like to hear from him. But the Government does not intend to call, but defense may. So that would be our evidence, Your Honor.

THE COURT: Thank you, Mr. Aubart.

| | | |
|---|---|---|
| 14:08:07 | 1 | Does the defense wish to call the deputy? |
| 14:08:11 | 2 | MS. DRISCOLL:  We do not intend to call Detective |
| 14:08:13 | 3 | White, but we do have some evidence that we would like to |
| 14:08:17 | 4 | present. |
| 14:08:17 | 5 | THE COURT:  Okay. |
| 14:08:18 | 6 | MS. DRISCOLL:  All right.  At this time we would |
| 14:08:21 | 7 | like to call Ms. Shelby Smith. |
| 14:08:30 | 8 | THE CLERK:  Please place your left hand on the |
| 14:08:32 | 9 | Bible, raise your right hand.  State your name for the |
| 14:08:33 | 10 | record. |
| 14:08:34 | 11 | THE WITNESS:  My name is Shelby Smith. |
| 14:08:34 | 12 | **SHELBY SMITH,** |
| 14:08:52 | 13 | was first duly sworn and testified as follows: |
| 14:08:52 | 14 | DIRECT EXAMINATION BY MS. DRISCOLL: |
| 14:08:53 | 15 | Q.  Good afternoon. |
| 14:08:54 | 16 | A.  Good afternoon, ma'am. |
| 14:08:55 | 17 | Q.  If you can please spell your name and say your name |
| 14:08:58 | 18 | for the record. |
| 14:08:59 | 19 | A.  My name is Shelby Smith.  S-H-E-L-B-Y.  Smith, |
| 14:09:06 | 20 | S-M-I-T-H. |
| 14:09:07 | 21 | Q.  And if you could please tell the Court where you're |
| 14:09:09 | 22 | employed. |
| 14:09:10 | 23 | A.  I am an investigator at the federal public defender's |
| 14:09:14 | 24 | office. |
| 14:09:14 | 25 | Q.  And how long have you been employed in the defender's |

| | | |
|---|---|---|
| 14:09:18 | 1 | office? |
| 14:09:18 | 2 | A.   Since October of last year. |
| 14:09:19 | 3 | Q.   And can you tell the Court where you previously |
| 14:09:21 | 4 | worked? |
| 14:09:22 | 5 | A.   Previously, I worked at the Rocky Mount Police |
| 14:09:25 | 6 | Department. |
| 14:09:25 | 7 | Q.   Okay.  And how long were you employed there? |
| 14:09:28 | 8 | A.   From December of 2023 to October of 2024, when I |
| 14:09:33 | 9 | started here. |
| 14:09:34 | 10 | Q.   And what was the rank that you achieved there? |
| 14:09:36 | 11 | A.   I was a detective. |
| 14:09:37 | 12 | Q.   Okay.  And prior to that, where did you work? |
| 14:09:39 | 13 | A.   The Nash County Sheriff's Office. |
| 14:09:41 | 14 | Q.   And how long did you work there? |
| 14:09:43 | 15 | A.   Since 2018. |
| 14:09:45 | 16 | Q.   Okay.  So would it be fair to say that before joining |
| 14:09:49 | 17 | the federal defender's office, you had been in law |
| 14:09:51 | 18 | enforcement for seven and a half years? |
| 14:09:52 | 19 | A.   Yes, ma'am. |
| 14:09:53 | 20 | Q.   Okay.  Briefly, have you received any special awards |
| 14:09:57 | 21 | as a law enforcement officer? |
| 14:09:58 | 22 | A.   I have. |
| 14:09:59 | 23 | Q.   And could you tell the Court briefly what they are? |
| 14:10:02 | 24 | A.   Yes, I can.  The most recent would have been the |
| 14:10:07 | 25 | heroism award I received from the U.S. attorney's office |

14:10:12  1  for a case that they had prosecuted.  I was nominated.

14:10:16  2  Prior to that, I've been officer of the year through the

14:10:18  3  Fraternal Order of Police.  And also Hometown Hero.

14:10:22  4  Q.  Okay.  Thank you.

14:10:22  5     Turning now to Mr. Vernon's case.  Did you have an

14:10:26  6  opportunity to visit Newsome Street in Ahoskie, North

14:10:30  7  Carolina?

14:10:30  8  A.  I have.

14:10:30  9  Q.  And if I can show you what's been labeled as Defense

14:10:33  10  Exhibits 5 through 8.

14:10:39  11     If you could, please tell the Court what these -- are

14:10:42  12  you familiar with these exhibits?

14:10:43  13  A.  I am.

14:10:44  14  Q.  Okay.  And could you -- what are they?

14:10:49  15  A.  I took these pictures.

14:10:51  16  Q.  Okay.  And what do they depict?

14:10:54  17  A.  This was the intersection of Hart Street and Newsome

14:10:59  18  Street.

14:10:59  19  Q.  Okay.  And do these pictures accurately reflect what

14:11:03  20  Hart Street and Newsome Street?

14:11:05  21  A.  Yes, ma'am.

14:11:06  22     MS. DRISCOLL:  At this time I would like to offer

14:11:07  23  them into evidence, sir.

14:11:08  24     THE COURT:  What time of year were they taken?

14:11:12  25     THE WITNESS:  I took them, like, probably a month

14:11:14  1  or so ago.

14:11:15  2          THE COURT:  Okay.  Any objection?

14:11:18  3          MR. AUBART:  No, Your Honor.

14:11:19  4          THE COURT:  They're admitted.

14:11:20  5          MS. DRISCOLL:  Thank you, sir.

14:11:21  6              (Defendant's Exhibits 5 through 8 are

14:11:23  7               received.)

14:11:23  8  Q.  If you could, please tell the Court, when you went

14:11:26  9  there, were there people parked on the street?

14:11:28  10  A.  There was not, that I recall, any cars parked on the

14:11:32  11  street except for the one that I was in.

14:11:34  12  Q.  All right.  And in -- so there was no need to park

14:11:37  13  directly in front of 1020 Newsome Street, was there?

14:11:40  14  A.  No, ma'am.

14:11:40  15  Q.  There was plenty of other parking on the street;

14:11:43  16  correct?

14:11:43  17  A.  Yes, ma'am.

14:11:43  18  Q.  Okay.  All right.  Turning now to CAD reports.  Did

14:11:53  19  you have an opportunity to subpoena CAD reports for Newsome

14:11:58  20  Street?

14:11:58  21  A.  Yes, ma'am.

14:11:58  22  Q.  Okay.  And please tell the Court what dates you were

14:12:05  23  able to subpoena.

14:12:07  24  A.  I subpoenaed the --

14:12:10  25          THE COURT:  Now, counsel, are we -- we're going

| | | |
|---|---|---|
| 14:12:13 | 1 | into an entirely new area that was not before the Court at |
| 14:12:16 | 2 | the prior hearing and without notice. |
| 14:12:19 | 3 | MS. DRISCOLL:  Your Honor, there was testimony in |
| 14:12:23 | 4 | the prior hearing about this being a dangerous area and |
| 14:12:27 | 5 | that this was a -- a high-crime area.  And so what we were |
| 14:12:32 | 6 | going to show is that we have pulled all the CAD records |
| 14:12:35 | 7 | for one year of all the houses that are on Newsome Street. |
| 14:12:39 | 8 | And we specifically also pulled a record to see if there |
| 14:12:42 | 9 | were any shots-fired calls.  That is the evidence that we |
| 14:12:45 | 10 | would like to present. |
| 14:12:48 | 11 | THE COURT:  Mr. Aubart, what's the United States's |
| 14:12:50 | 12 | position on this? |
| 14:12:51 | 13 | MR. AUBART:  Well, I haven't seen said CAD |
| 14:12:55 | 14 | reports.  We do have a reciprocal discovery request and |
| 14:12:59 | 15 | nothing's been provided to me.  So at the very least I |
| 14:13:02 | 16 | would ask to review them. |
| 14:13:05 | 17 | My understanding of reopening this hearing, it was |
| 14:13:08 | 18 | based on the video and that it showed a different angle of |
| 14:13:11 | 19 | how the frisk was conducted.  It doesn't change any of the |
| 14:13:15 | 20 | foundational aspects of why the frisk was conducted, why |
| 14:13:21 | 21 | the stop and the encounter occurred.  So I would agree with |
| 14:13:24 | 22 | Your Honor that we're diving way back into the beginning |
| 14:13:29 | 23 | without notice, because I haven't been provided anything. |
| 14:13:33 | 24 | THE COURT:  All right.  Well, we're certainly |
| 14:13:36 | 25 | beyond the scope of what the Court heard and ordered this |

14:13:40    1   reopened for.  What I'm going to do is take a ten-minute

14:13:43    2   recess and you can talk to each other about what this is

14:13:45    3   about, exchange anything that Mr. Aubart needs to see.

14:13:49    4   We'll come back in ten minutes.  I'll permit this to come

14:13:51    5   in, but this is not what the scope of the hearing was

14:13:54    6   supposed to be.

14:14:07    7                    (A recess is taken at 2:14 p.m.)

14:22:49    8                    (Court is called to order at 2:22 p.m.)

14:22:56    9           THE COURT:  All right.  You may proceed, counsel.

14:22:58   10           MS. DRISCOLL:  Thank you, Your Honor.

14:23:04   11   BY MS. DRISCOLL:

14:23:04   12   Q.  So you -- if you could, when did you -- for what

14:23:08   13   period of time did you subpoena CAD reports on Newsome

14:23:13   14   Street?

14:23:14   15   A.  The most recent ones were subpoenaed on -- from 11/9

14:23:19   16   of 2022 to 11/9 of 2023.

14:23:24   17   Q.  Okay.  And what did you subpoena?

14:23:28   18   A.  The Call Automated Dispatch.  The acronym is going to

14:23:34   19   be CAD, C-A-D.  The reports related to all residences on

14:23:44   20   Newsome Street.  And I also requested any shots-fired calls

14:23:50   21   in the area of Newsome Street for the period of 11/2 --

14:23:58   22   11/9 of 2022 to 11/9 of 2023.

14:24:01   23   Q.  Okay.  And the records were returned to you; is that

14:24:05   24   correct?

14:24:05   25   A.  Yes, ma'am.

14:24:05  1  Q.   And was there a certificate from the custodian of

14:24:07  2  records indicating that they were complete?

14:24:09  3  A.   There was.

14:24:10  4       THE COURT:  How was the area of Newsome Street

14:24:13  5  defined?

14:24:17  6  Q.   If you could, just -- if you could just briefly

14:24:20  7  describe Newsome Street.  Is it an open-ended street?

14:24:23  8       THE COURT:  I understand what Newsome Street is.

14:24:24  9  There was a request for all shots fired of the area of

14:24:28  10  Newsome Street.  How was that -- what were the parameters

14:24:30  11  of that search?

14:24:33  12       THE WITNESS:  Your Honor, the calls -- sometimes

14:24:37  13  when there's a shots-fired call in an area on Newsome

14:24:41  14  Street, like Newsome Street would be listed with an

14:24:44  15  intersection, not necessarily a call tied to a specific

14:24:49  16  address.  So I wanted to be sure that if Newsome Street was

14:24:53  17  listed as a shots-fired call in the dispatch system, that

14:24:57  18  we were sure to request that.

14:24:59  19       THE COURT:  Okay.  Did you also request it for all

14:25:01  20  of the areas in, like, a six- or eight-block area around

14:25:05  21  Newsome Street?  Or was it Newsome Street mentioned only?

14:25:09  22       THE WITNESS:  It was Newsome Street.

14:25:11  23       THE COURT:  Okay.

14:25:14  24  Q.   Okay.  And if you could -- if you could, look at

14:25:25  25  Defense Exhibit Number 4.

14:25:29 1  A.   Yes, ma'am.

14:25:30 2  Q.   If you could tell the Court what that is.

14:25:33 3  A.   That is a table created to -- that listed the calls

14:25:41 4  for service dispatch records that we received as individual

14:25:46 5  records, just as an easier visual so it was easier to look

14:25:51 6  at all at one time.

14:25:53 7  Q.   Okay.

14:25:56 8        MS. DRISCOLL:  At this time, Your Honor, if I

14:25:57 9  could enter into evidence the CAD reports, which would be

14:26:02 10  Defense Exhibit Number 3, and the response detail log,

14:26:05 11  which is Defense Exhibit Number 4.

14:26:08 12        THE COURT:  They're admitted.

14:26:09 13        MS. DRISCOLL:  Thank you.

14:26:10 14          (Defendant's Exhibits 3 and 4 are received.)

14:26:10 15  Q.   In looking at the CAD reports, to be clear, the second

14:26:13 16  subpoena that you're referring to did not include 1020

14:26:17 17  Newsome Street and 1100 Newsome Street; is that correct?

14:26:18 18  A.   Yes, ma'am.

14:26:20 19  Q.   And if -- why did you not include that?

14:26:23 20  A.   We had already received it.

14:26:25 21  Q.   Okay.  Would it be fair to say that it had already

14:26:28 22  been testified to?

14:26:28 23  A.   Yes, ma'am.

14:26:29 24  Q.   Okay.  And in it, are there any drugs or narcotics

14:26:35 25  calls?

| | | |
|---|---|---|
| 14:26:36 | 1 | A.   No, ma'am. |
| 14:26:37 | 2 | Q.   Are there any search warrants that were brought -- |
| 14:26:41 | 3 | called into CAD? |
| 14:26:42 | 4 | A.   No, ma'am. |
| 14:26:43 | 5 | Q.   Would you expect a search warrant to be called into |
| 14:26:45 | 6 | CAD? |
| 14:26:46 | 7 | A.   Though I have never been a law enforcement officer in |
| 14:26:50 | 8 | the city of Ahoskie, I worked in the city of Ahoskie.  From |
| 14:26:55 | 9 | my experience, yes, they would -- for officer safety |
| 14:26:57 | 10 | reasons, they would document it in CAD. |
| 14:26:59 | 11 | Q.   Were there any crimes-of-violence calls? |
| 14:27:01 | 12 | A.   No, ma'am. |
| 14:27:02 | 13 | Q.   Were there -- and you said -- were there any |
| 14:27:06 | 14 | shots-fired calls from Newsome Street? |
| 14:27:08 | 15 | A.   No, ma'am. |
| 14:27:09 | 16 | Q.   Were there any arrests during that year that went back |
| 14:27:13 | 17 | to Newsome Street? |
| 14:27:14 | 18 | A.   No, ma'am. |
| 14:27:16 | 19 | MS. DRISCOLL:  I don't have any further questions, |
| 14:27:17 | 20 | Your Honor. |
| 14:27:17 | 21 | THE COURT:  Thank you, counsel. |
| 14:27:19 | 22 | Cross-examination. |
| 14:27:21 | 23 | MR. AUBART:  Yes. |
| 14:27:22 | 24 | CROSS-EXAMINATION BY MR. AUBART: |
| 14:27:22 | 25 | Q.   Exhibit 4 is still on your screen; is that right? |

14:27:25 1    A.   Yes, sir.

14:27:26 2    Q.   That second column after 1 through 32, what is that

14:27:30 3    column showing?

14:27:35 4    A.   The number -- the house number on Newsome Street.

14:27:38 5    Q.   On Newsome Street?

14:27:39 6    A.   Yes, sir.

14:27:40 7    Q.   So no other streets?

14:27:43 8    A.   No, sir.

14:27:45 9    Q.   So you didn't request any records for Martin Luther

14:27:51 10   King Drive?

14:27:57 11   A.   I think that's an intersection of Troy.

14:28:00 12   Q.   But you didn't request any records for it?

14:28:04 13   A.   No, sir.

14:28:05 14   Q.   You didn't request any records for the addresses on

14:28:08 15   Troy Street?

14:28:10 16   A.   I believe we did initially.

14:28:10 17                 (Mr. Aubart and Ms. Driscoll confer.)

14:28:25 18        MR. AUBART:  I apologize, Your Honor.  I still

14:28:27 19   haven't seen the subpoenas themselves.

14:28:59 20                 (Pause.)

14:28:59 21        MS. DRISCOLL:  Your Honor, I might be able to

14:29:01 22   clarify if there was a second subpoena that did include

14:29:07 23   Troy Street.  That was not what we were presenting today

14:29:07 24   and we don't have that with us.  But to answer, there was a

14:29:10 25   second subpoena for Troy Street as well.

14:29:11  1          THE COURT:  All right.  What other streets was it

14:29:14  2   for?

14:29:15  3          MS. DRISCOLL:  I'm sorry.  I didn't hear it.

14:29:16  4          THE COURT:  What other streets was it for?  Or

14:29:17  5   just for Troy?

14:29:19  6          MS. DRISCOLL:  It was -- it was just those two

14:29:20  7   streets that we did.

14:29:22  8          THE COURT:  Okay.  We don't have that with us here

14:29:26  9   today?

14:29:26  10          MS. DRISCOLL:  I'm sorry?

14:29:27  11          THE COURT:  You don't have that here with you

14:29:28  12   today?

14:29:28  13          MS. DRISCOLL:  No, we do not.

14:29:29  14          THE COURT:  Was it because there were no responses

14:29:32  15   on Troy Street?

14:29:33  16          MS. DRISCOLL:  There was responses on Troy Street.

14:29:35  17   I started thinking that it was getting too far away.  There

14:29:38  18   might have -- in all -- I think there was a domestic call

14:29:41  19   on Troy Street.  I do not believe anyone was arrested on

14:29:45  20   Troy Street.  There was -- it appears that there was two

14:29:49  21   Troy streets.  One was from far away -- a faraway Troy

14:29:54  22   Street had a shots-fired call in the year.  But the Troy

14:29:57  23   Street bias did not -- it just seemed -- it didn't seem

14:30:01  24   apropos to today's hearing, so that was why I excluded it.

14:30:05  25   But I do want to clarify that there was a second subpoena.

| | | |
|---|---|---|
| 14:30:08 | 1 | THE COURT:  All right.  Thank you. |
| 14:30:26 | 2 | MR. AUBART:  I don't have any further questions, |
| 14:30:27 | 3 | Your Honor. |
| 14:30:27 | 4 | THE COURT:  Was there a map of the area that was |
| 14:30:29 | 5 | presented at some point that had the streets in the area? |
| 14:30:32 | 6 | MS. DRISCOLL:  Yes, Your Honor.  We can bring it |
| 14:30:34 | 7 | up. |
| 14:30:34 | 8 | THE COURT:  Can you put it up again. |
| 14:30:59 | 9 | And so were records requested for Martin Luther |
| 14:31:06 | 10 | King, Snipes in addition to Troy and Newsome? |
| 14:31:10 | 11 | MS. DRISCOLL:  No, Your Honor. |
| 14:31:12 | 12 | THE COURT:  All right. |
| 14:31:13 | 13 | MR. AUBART:  And, Your Honor, I'm told just north |
| 14:31:15 | 14 | of Troy Street, as it's oriented on your screen, is a Baker |
| 14:31:20 | 15 | Street that I believe was mentioned in a prior testimony. |
| 14:31:22 | 16 | THE COURT:  Okay.  And I want to be clear:  You've |
| 14:31:35 | 17 | not worked in Ahoskie and haven't talked with Ahoskie folks |
| 14:31:42 | 18 | about what shows up when they execute a warrant in those |
| 14:31:44 | 19 | records? |
| 14:31:45 | 20 | THE WITNESS:  That's correct, Your Honor.  I have |
| 14:31:46 | 21 | not. |
| 14:31:47 | 22 | THE COURT:  And did you request all search |
| 14:31:49 | 23 | warrants that were served in Martin Luther King, Snipes, |
| 14:31:55 | 24 | Troy, or Newsome? |
| 14:31:56 | 25 | THE WITNESS:  No, Your Honor.  Just what I |

| | |
|---|---|
| 14:31:58 | 1 |

testified to.

THE COURT:  Okay.  Thank you.

THE WITNESS:  Yes, sir.

THE COURT:  Any questions in light of the Court's questions?

MR. AUBART:  Not from the Government, Your Honor.

MS. DRISCOLL:  No, Your Honor.

THE COURT:  All right.  Thank you.  You may step down.

THE WITNESS:  Yes, sir.

MS. DRISCOLL:  Nothing further from the defense, Your Honor.

THE COURT:  All right.  I'll hear argument based on anything material that either party believes has changed as a result of the new angle from the video.  That is, I'll say it appears to the Court, having reviewed the video, that the defendant's front pocket on his hoodie was directly searched; it was not patted down.  And both of his front pockets were frisked and then searched, one at a time, and that the frisk of the left front pant pocket revealed something that was then removed from the pocket and turned out to be a firearm.  That's what I observed. If the parties observed anything contrary to that, please tell me.

MR. AUBART:  Your Honor, the Government agrees

14:33:25  1   with that summation.  We agree the hoodie pocket was

14:33:30  2   directly searched and that the jeans were frisked.  And

14:33:37  3   because of that, the search or the frisk that recovered the

14:33:41  4   firearm was a valid Terry frisk, and we believe the motion

14:33:46  5   to suppress should be denied.

14:33:48  6         An instructive case -- it's not binding,

14:33:53  7   obviously.  It's from the district court in the district of

14:33:55  8   Maryland.  It's 2025 Westlaw 934511.  It discusses a

14:34:03  9   Baltimore P.D. case where there was two officers conducting

14:34:09  10   a Terry frisk on the same individual.  One of the officers

14:34:13  11   conducted a search that exceeded the bounds of Terry by

14:34:18  12   going directly into a pocket.  The other officer did a

14:34:22  13   correct -- correctly conducted frisk before finding drugs

14:34:27  14   in that pocket.  I don't believe that the -- the incorrect

14:34:33  15   search on the hoodie pocket taints the proper search that's

14:34:36  16   later conducted.  I think this case is supportive of it.

14:34:41  17         This case also looks at inevitable discovery,

14:34:44  18   which basically says if the officer who had been conducting

14:34:49  19   the proper Terry frisk had continued his frisk, he would

14:34:53  20   have found the gun that the officer who was diving in the

14:34:56  21   pockets found.  Here, again, impermissive search of the

14:35:01  22   hoodie pocket, proper frisk of the jeans, that's a

14:35:07  23   continuation and the proper frisk is -- the Government

14:35:11  24   argues is proper and should not be suppressed.

14:35:17  25         The law doesn't require perfection from officers.

1  And if there had been anything relevant in that hoodie

2  pocket, we would agree that it should be suppressed.

3          THE COURT:  So your position is that that's not a

4  proper search pursuant to probable cause based on the odor

5  of marijuana?

6          MR. AUBART:  Well, this is on the Terry frisk

7  angle, Your Honor.

8          THE COURT:  I know.  I want to separate those two

9  things.

10          MR. AUBART:  Yes, Your Honor.

11          THE COURT:  It is a non-frisk search, whether or

12  not that's a permissible non-frisk search -- I'm with you

13  that it's not a frisk; it's a search.

14          MR. AUBART:  Okay.  Agree.

15          And if we're looking at it solely as a basis under

16  Terry, it would be suppressible.  However, agreed, Your

17  Honor, that with the odor of marijuana, with the admission

18  that they were immediately previously smoking marijuana,

19  there was probable cause to also search for evidence of

20  that contraband, which would be marijuana.  I don't think

21  you have to get there, though, because I think that the

22  frisk of the jeans was valid and proper and helps remove

23  some of the question of, you know, are we in the

24  vehicle-stop realm where we have exigency concerns or are

25  we approaching random people on the street who smell like

| | |
|---|---|
| 14:36:34 | 1 |
| 14:36:35 | 2 |
| 14:36:41 | 3 |
| 14:36:45 | 4 |
| 14:36:49 | 5 |
| 14:36:52 | 6 |
| 14:36:57 | 7 |
| 14:37:00 | 8 |
| 14:37:03 | 9 |
| 14:37:07 | 10 |
| 14:37:12 | 11 |
| 14:37:13 | 12 |
| 14:37:17 | 13 |
| 14:37:22 | 14 |
| 14:37:26 | 15 |
| 14:37:26 | 16 |
| 14:37:28 | 17 |
| 14:37:30 | 18 |
| 14:37:31 | 19 |
| 14:37:33 | 20 |
| 14:37:41 | 21 |
| 14:37:44 | 22 |
| 14:37:47 | 23 |
| 14:37:50 | 24 |
| 14:37:53 | 25 |

1  marijuana and searching them?

2      I think legally it's a bit safer to rely on *Terry*

3  and to look at the actual frisk that you can see in the

4  second video where it was clearly touching over the outer

5  clothing, feels a hard object.  That could be a weapon.

6  Pulls it out halfway; it's a phone.  He sticks it back in.

7  Doesn't dive in to poke around the rest of the pocket.

8  Frisk the left pant's pocket.  Again, I believe his

9  testimony is that he felt a handle of a gun, pulled it out,

10  it's a gun.  That's a valid frisk and search under *Terry*.

11      THE COURT:  All right.  I'm just making sure that

12  my record is clean on what the concession is.  The

13  concession is that it is a non-*Terry* search of the pocket

14  but not a concession that it is an illegal search of the

15  pocket.

16      MR. AUBART:  Yes, Your Honor.  That's the

17  concession.

18      THE COURT:  All right.  I'll hear from the

19  defense.

20      MS. DRISCOLL:  Your Honor, I'm not sure if you're

21  already ruling that it was not a frisk and a search, but --

22      THE COURT:  As to the front pocket, I'm ruling

23  that that is a search, not a frisk.  As to the pants, it's

24  a frisk first followed by a search.

25      MS. DRISCOLL:  Well --

14:37:54 1        THE COURT:  Now, the question about what is fruit

14:37:57 2   of what is a separate question.  But as to the behavior, it

14:38:00 3   is a search without a frisk of the front pocket, it is a

14:38:04 4   frisk followed by a search of the pants pockets.  Now,

14:38:08 5   there is a fruit-of-the-poisonous-tree question, and

14:38:11 6   there's a question as to whether or not anything in that

14:38:13 7   front pocket then prompted the search -- the hoodie pocket

14:38:20 8   and then prompted the search of the pants pockets.

14:38:22 9        And so I understand that the defense's position is

14:38:25 10  that those are inseparable and that it is all one tree.  I

14:38:30 11  understand that.  There's case law that makes it more

14:38:36 12  divisible than that, and I'm going to go back and reread it

14:38:39 13  and think about it.  But as to what physically happened,

14:38:42 14  the hoodie pocket was searched without a frisk.  He put his

14:38:45 15  hands from around behind him and put his hands in the

14:38:48 16  pocket.  He then slid his hands down the outer covering of

14:38:52 17  the pants pockets one at a time, the right pocket first.

14:38:56 18  It looks like he felt a hard object, removed it, put it

14:38:59 19  back in.  Ran his hand down the left front pocket, felt a

14:39:03 20  hard object, pulled it out, it was a firearm.  He testified

14:39:06 21  at the last hearing that he thought it was the handle of a

14:39:11 22  firearm when he reached into the left pant pocket.

14:39:14 23        I think those are the facts.  Now, what the legal

14:39:18 24  import of those facts is, is a separate question.  But

14:39:20 25  you're asking me what I'm saying.  That's what I'm

14:39:22  1   saying --

14:39:22  2          MS. DRISCOLL:  Yes, sir.

14:39:23  3          THE COURT:  -- I see as happening.

14:39:24  4          MS. DRISCOLL:  Yes, sir.  So we would start by

14:39:27  5   saying, of course, we agree with you that it is a search

14:39:29  6   and it is not a frisk, and that it was -- it seemed to be

14:39:33  7   his method of how he was doing it.  He did it first to

14:39:36  8   Dayquan early, the first gentleman that was searched.  And

14:39:39  9   he -- anything he felt, he brought out.  He inspected it.

14:39:41  10  He inspected the cigarette cases with his flashlight.  He

14:39:45  11  inspected the cigar casing with a flashlight, of

14:39:49  12  Mr. Vernon.  He looked at the cell phones.  He looked at

14:39:53  13  the money.  He looked at anything and everything.  He

14:39:55  14  looked to see -- when he touched the pocket, it was to see

14:39:58  15  if there was anything in the pocket.  It was not to see

14:40:00  16  whether it was a firearm or a weapon.  It was just to see.

14:40:04  17          So we would submit that, yes, it was a search;

14:40:05  18  it's not a Terry frisk.  That's the first thing we would

14:40:07  19  say.  We would say that he was -- of course, at the very

14:40:10  20  beginning, was seized immediately when the officer pulled

14:40:13  21  up, the way he pulled up, plenty of room to not pull up

14:40:17  22  right there.  That he was seized immediately and that then

14:40:18  23  he starts a search.

14:40:21  24          You know, we would say that he can't just walk up

14:40:26  25  and decide that there's an odor of marijuana and someone

| | |
|---|---|
| 14:40:29 | 1 |
| 14:40:33 | 2 |
| 14:40:35 | 3 |
| 14:40:38 | 4 |
| 14:40:43 | 5 |
| 14:40:45 | 6 |
| 14:40:50 | 7 |
| 14:40:53 | 8 |
| 14:40:56 | 9 |
| 14:40:59 | 10 |

1  says that they'd recently done misdemeanor activity and --

2  outside of the officer's presence and that gives him the

3  ability to walk up, under North Carolina law, and search

4  them.  And so -- that this is -- we would say is

5  misdemeanor activity done outside the presence of the

6  officer.  This is not something that he has a warrant to

7  now, you know, execute on this person.  This is a

8  warrantless search that is being done on an individual for

9  misdemeanor activity done outside of the officer's

10  presence.

11         Yes, there's the admission that we just recently

12  smoked a blunt, but there's no time frame to it.  And

13  there's the odor of marijuana that's lingering in the air.

14         We would say that it's a bad search.  He did not

15  have an authority to walk up to them and search them.

16         THE COURT:  Could he frisk him?

17         MS. DRISCOLL:  I would -- could he frisk him?

18         THE COURT:  Could he frisk?

19         MS. DRISCOLL:  It's our position that, no, he

20  couldn't because --

21         THE COURT:  Why?

22         MS. DRISCOLL:  Well -- and I understand the case

23  law that was previously cited by Your Honor, and I think --

24  actually, I think I have the case with me, about the odor

25  of marijuana in a traffic pull is enough to -- the Fourth

| | |
|---|---|
| 14:41:37 | 1 |

Circuit case is enough to immediately frisk somebody.

We, first of all, don't agree with that case and that that's consistent with what the constitutional Fourth Amendment searches. We do not agree that that's what the Supreme Court has held. And that would be how we would start that. But he has to have an articulable suspicion that the person is armed and dangerous, and there is no articulable suspicion that he is armed and dangerous.

He -- we would go also back to the credibility of the officer. The officer sat here and testified that he frisked him. This is an officer that had 20 years of experience. He was a lieutenant in the Ahoskie Police Department. He knows exactly the difference between a search and a frisk. He wrote repeatedly in his reports that it was a search. He wrote it in the arrest report it was a search. He wrote it in the felony investigative report it was a search. He wrote it -- he wrote it repeatedly as a search. It wasn't until he testified before the Court that it became a frisk. It was never a frisk; it was always a search.

He told you that he thought he had consent because he put up his arms and didn't fight him. And that probably, I believe, is where the truth is. I don't think he ever thought that the guy was armed and dangerous, which is why he turned around initially and walked back to his

| | |
|---|---|
| 14:42:54 | 1 |
| 14:42:57 | 2 |
| 14:43:04 | 3 |
| 14:43:07 | 4 |
| 14:43:11 | 5 |
| 14:43:15 | 6 |
| 14:43:21 | 7 |

14:42:54  1  car and left another officer standing there holding a

14:42:57  2  flashlight.  That would be the defense's position.  We

14:43:04  3  would submit that the inevitable discovery, that this would

14:43:07  4  have inevitably been found had absent the unconstitutional

14:43:11  5  search is -- that's mere speculation that would have been

14:43:15  6  found.  And we would submit that -- and it's not binding on

14:43:21  7  the Court, I recognize.

14:43:22  8      But under *United States v. Brandon* in West -- it's

14:43:27  9  a 2023 case.  It is out of -- it's out of the District of

14:43:33  10  Maryland.  It's 2023 Westlaw 6961937.  The Court goes on to

14:43:43  11  hold that mere speculation that evidence could have been

14:43:47  12  discovered absent unconstitutional conduct is not

14:43:50  13  sufficient.

14:43:51  14      And so we argue that that isn't this case.  That

14:43:55  15  this is not a -- first of all, he did not have proper

14:43:59  16  justification to do a frisk.  He can't do an inventory

14:44:03  17  search pursuant to an arrest because he doesn't have

14:44:05  18  authority to arrest an individual without a warrant for

14:44:09  19  misdemeanor conduct done outside of his presence under

14:44:12  20  North Carolina law.  So he didn't have the ability to do an

14:44:15  21  inventory search.  He is -- he does not do a Terry frisk.

14:44:20  22  He's just going into the pockets.  And he's consistent in

14:44:23  23  how he does it.  He took the stand and he told -- he told

14:44:27  24  Your Honor that he was frisking him when he knew exactly he

14:44:30  25  was searching him.

| | | |
|---|---|---|
| 14:44:30 | 1 | THE COURT: So he did not -- Bitter did not slide |
| 14:44:33 | 2 | his hands down the outer pockets on the blue jeans when he |
| 14:44:37 | 3 | searched -- when he frisked him first and then searched |
| 14:44:40 | 4 | him? |
| 14:44:40 | 5 | MS. DRISCOLL: I would say he did not. I would |
| 14:44:42 | 6 | say that on the left pocket where the gun -- |
| 14:44:42 | 7 | THE COURT: That that didn't happen? |
| 14:44:44 | 8 | MS. DRISCOLL: He touched it. It's a one-second |
| 14:44:46 | 9 | touch and then he's got his hand in the pocket. |
| 14:44:48 | 10 | THE COURT: All right. |
| 14:44:49 | 11 | MS. DRISCOLL: So I don't think based on that -- |
| 14:44:51 | 12 | THE COURT: If that's your factual position, the |
| 14:44:53 | 13 | Court disagrees. |
| 14:44:53 | 14 | MS. DRISCOLL: Pardon? |
| 14:44:54 | 15 | THE COURT: If that's your factual position, |
| 14:44:56 | 16 | that's not what happened. |
| 14:44:58 | 17 | MS. DRISCOLL: Okay. That was how I understood |
| 14:45:00 | 18 | it. And I've watched the video repeatedly. |
| 14:45:01 | 19 | THE COURT: I understand. It's my ruling, and I'm |
| 14:45:03 | 20 | ruling that it didn't happen. |
| 14:45:03 | 21 | MS. DRISCOLL: No. I understand. |
| 14:45:04 | 22 | THE COURT: So make your argument on the basis of |
| 14:45:07 | 23 | the facts that the Court is going to find. It will be more |
| 14:45:14 | 24 | helpful. |
| 14:45:14 | 25 | MS. DRISCOLL: I don't know if I have much more to |

14:45:16   1    say than what I've already said, but I'm happy to answer

14:45:19   2    any questions that the Court has.

14:45:20   3           THE COURT: Thank you, counsel.

14:45:23   4           Mr. Aubart, I'll give you the last word.

14:45:27   5           MR. AUBART: Your Honor, I don't think there's any

14:45:28   6    reason to revisit your prior ruling. The -- regarding the

14:45:34   7    cause for conducting a frisk. The CAD reports provided are

14:45:39   8    incomplete. They don't cover the entire area. And

14:45:43   9    specifically, I'll go back to the testimony of the officer,

14:46:04  10    which he is describing the area. This is on page 41 -- it

14:46:13  11    starts on page 41 of the transcript, Your Honor. Which is,

14:46:17  12    "Being where we've got a," and then on to page 42, "lot of

14:46:21  13    crime, where we've seized drugs and guns in a

14:46:25  14    two-to-three-block radius, and the fact that guns and drugs

14:46:27  15    go together and they were there smoking where we've gotten

14:46:29  16    shots fired calls and officers hear shots fired in the area

14:46:32  17    again, like back to Troy Street and where the shot house is

14:46:35  18    and Baker Street," that he's seen in his career.

14:46:39  19           So he's clearly describing a much larger area than

14:46:43  20    simply Newsome Street, and I don't think those CAD reports

14:46:48  21    should provide any basis in terms of saying that this is

14:46:52  22    somehow not a high-crime area or that his testimony on that

14:46:56  23    point was incorrect.

14:47:00  24           THE COURT: All right. I'll hear from the defense

14:47:02  25    on any argument regarding the CAD report. I think I cut

14:47:05 1    you off before you got to your CAD report.  I'm sorry.

14:47:08 2            MS. DRISCOLL:  Your Honor, just to -- to point out

14:47:12 3    something else in the transcript, which would be page 48

14:47:16 4    after what Mr. Aubart just read.  Lieutenant White does

14:47:20 5    say -- and I think it's in response to your questions.  He

14:47:24 6    turns -- it's in response to my question.  I'm sorry.  No,

14:47:27 7    I'm sorry.  It is your question.  You ask him, "When you

14:47:30 8    say that, does that mean that you stand where you are

14:47:32 9    standing and turn and point to it?"  Meaning the houses and

14:47:35 10   if there's crime on Newsome Street.  And he says, "Yes,

14:47:38 11   sir.  I can point out -- from standing where my truck was

14:47:42 12   parked, I can point out to at least two houses that we have

14:47:45 13   seized a significant amount of drugs and guns out of, one

14:47:47 14   of which was a federal level crime with guns and

14:47:49 15   significant amount of drugs, yes, sir."

14:47:52 16           And we would submit that that was what we were

14:47:55 17   looking at --

14:47:56 18           THE COURT:  You think the CAD report is contrary

14:47:58 19   to that?

14:47:58 20           MS. DRISCOLL:  Yes, sir, I do.  I mean, you know,

14:48:01 21   we didn't go back ten years; we went back a year.  But he,

14:48:05 22   I think -- and it was repeatedly asked throughout his

14:48:08 23   testimony about what are you talking about?  Where is the

14:48:11 24   crime?  Where's the high-crime area and what kind of crime?

14:48:15 25   And he then comes out and -- on your question and says

| | |
|---|---|
| 14:48:17 | 1 |

that.  And that's why we went back a whole year for the
whole street.  And there was nothing that we found
consistent with that in the CAD reports on Newsome.  And so
that was -- that was where we were coming out on that.

        I don't have anything further, though.  Thank you,
sir.

        THE COURT:  Thank you, counsel.

        All right.  The hearing is concluded.  We'll be in
recess.

        (The proceedings concluded at 2:49 p.m.)

        * * * * *

**C E R T I F I C A T E**

    I certify that the foregoing is a correct
transcript from the record of proceedings in the
above-entitled matter.

        This the 11th day of July, 2025.


        /s/ Jennifer C. Carroll
        Jennifer C. Carroll, RMR, CRR
        Official Court Reporter